# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **BRADLEY EARL WALLACE,** | ) | |
| | ) | **No. 11 CV 4350** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | **August 20, 2012** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION and ORDER

Bradley Wallace challenges the Commissioner of Social Security's ("Commissioner")
denials of his applications for social security disability ("DIB") and supplemental security
income ("SSI") benefits under Title II of the Social Security Act, 42 U.S.C. § 423(d) and
Title XVI of the Social Security Act, 42 U.S.C. § 1382(c). Wallace's motion for summary
judgment is granted to the extent that this matter is remanded for further proceedings
consistent with this opinion. For the foregoing reasons, the court finds that the presiding
administrative law judge ("ALJ") deviated from the "treating physician rule" and erred in
assessing Wallace's credibility:

### Procedural History

Wallace applied for DIB and SSI benefits in July 2008 claiming that he became
disabled in March 2007 by anxiety, depression, and mood disorders. (Administrative Record
"A.R." 145-157.) His claims were denied initially and on reconsideration. (Id. at 64-67, 71-
78.) Following a hearing in June 2010, the presiding ALJ found Wallace not disabled as

defined by the Social Security Act and denied his claims for DIB and SSI benefits. (Id. at 13-26.) When the Appeals Council denied review, (id. at 5-10), the ALJ's decision became the final decision of the Commissioner, *see Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). Wallace then filed the current suit seeking judicial review of the ALJ's decision. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

Wallace was born in 1972 (A.R. 145) and was 35 years old when he allegedly became disabled. He had worked as a production assembler and building maintenance worker. (Id. at 56.) Before the ALJ, he testified that he had lost about four or five jobs because of problems stemming from his rapid cycling bipolar disorder (id. at 38-39), and explained that his last job ended in 2007 when he was not called back to work (id. at 36).

### A.    Medical Evidence

Wallace claims an onset date of March 25, 2007. (A.R. 145.) It appears from the record that he first sought treatment for depression in 2000—the record contains an evaluation submitted by Dr. Thomas Michalsen in April 2009 that states that he diagnosed Wallace with depression and bipolar disorder in 2000, and opined that he is "unable to work due to highs and lows." (Id. at 342.) Dr. Michalsen also noted that Wallace had not been on medication for approximately four years. (Id.) Apart from this record, the first medical evidence in the record is from Wallace's visit on September 5, 2008, to David NieKamp, Psy.D., for a mental status evaluation requested by the state disability agency. (Id. at 295-

298.)  After spending 45 minutes with Wallace, Dr. NieKamp opined that Wallace suffers

from "overt anxiety and depression that inhibits his ability to effectively find and maintain

gainful employment."  (Id. at 297.)  Dr. NieKamp diagnosed Wallace to be suffering from

moderate to severe anxiety and depression with a Global Assessment of Functioning

("GAF") score of 45.[1]  (Id. at 298.)  Around that time, an employee of the state disability

agency interviewed Wallace on the phone and noted that Wallace was "[c]ooperative but

there were a lot of background distractions.  Also, [claimant] was randomly laughing at some

questions and stating 'How stupid that you would ask that question to me.'"  (Id. at 207.)

Later that month, Carl Hermsmeyer, Ph.D, a state agency psychologist, assessed Wallace's

mental residual functional capacity ("RFC") and opined that he has "problems with

understanding, remembering and the ability to carry out detailed instructions, but the

claimant retains the mental capacity to perform simple one and two-step tasks at a consistent

pace."  (Id. at 299-315.)

   About a month later, Wallace sought treatment from Dr. Pocock, a practitioner of

family medicine, on November 8, 2008.  (Id. at 321-323.)  Wallace related his history of

eight years of bipolar disorder to Dr. Pocock, with no treatment for the last two years.  He

explained that he did not have health insurance.  (Id. at 321.)  Wallace claimed that he had

---

[1] A Global Assessment of Functioning ("GAF") score is used to measure an individual's
overall functional capacity.  A GAF score in the range of 41 to 50 indicates "[s]erious
symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any
serious impairment in social, occupational, or school functioning (e.g., no friends, unable to
keep a job)."  *Diagnostic and Statistical Manual of Mental Disorders, (DSM-IV)* 32-34 (4th
ed. 2000).

just emerged from a manic cycle, which he experienced as being extremely talkative, having racing thoughts, crazy dreams, an inability to sleep, and obsessive cleaning. (Id. at 323.) He also described that when he is depressed he hides in his room, has crying episodes, guilty thoughts, and poor appetite, and lies in bed without sleeping. (Id.) Dr. Pocock described Wallace as "jittery and nervous." (Id.) He diagnosed Wallace with bipolar disorder but did not prescribe medication at that time. (Id.)

The following month, on December 17, 2008, Dr. Pocock evaluated Wallace again. (Id. at 325-326.) He observed Wallace to be "happier but speech pressured," and noted that Wallace was sleeping only four hours a night. (Id.) He urged Wallace to seek treatment at the Ben-Gordon Center, prescribed Abilify, and directed Wallace to return in two weeks. (Id.) Wallace returned to Dr. Pocock on February 28, 2009. (Id. at 327.) Wallace had stopped taking Abilify because it had given him palpitations. (Id.) Dr. Pocock observed Wallace to be "in depressive phase of Bipolar disorder." (Id. at 328.) He prescribed Fluoxetine and directed Wallace to return in two weeks. (Id.)

In March 2009, Wallace visited the Ben Gordon Center for a comprehensive assessment with a psychiatrist, Dr. Samar Mahmood, and a therapist. (Id. at 334-338.) During a 53-minute consultation, Wallace described his experience of rapid cycling between manic and depressive episodes. (Id. at 334.) He described the following symptoms of mania: "extreme adrenaline, racing thoughts, decreased need for sleep, more talkative than usual, and an increase in goal-directed behavior (e.g., cleaning)." He reported that during manic periods, he does not sleep for three to four days. (Id.) He described his depressive cycles

to include: "depressed mood, markedly diminished interest in all activities, insomnia, fatigue, and feelings of worthlessness." (Id.) Wallace reported that he has had difficulty maintaining employment. (Id. at 335.) Dr. Mahmood characterized Wallace as being in a euphoric mood, with hyperactive motor activity and rapid speech, a normal attention span and clear thought process. (Id. at 335-336.) Dr. Mahmood concluded that "Brad currently meets criteria for Bipolar I Disorder, [m]ost recent episode mixed." (Id. at 336.) She noted that "Brad's symptoms of mania appear to have caused him to have difficulty sustaining employment." (Id. at 337.) She assessed his GAF score as 45. (Id.)

Wallace returned to see Dr. Mahmood on May 1, 2009, for a 50-minute appointment. (Id. at 367.) Wallace complained of rapid cycling of moods, extreme anxiety and panic attacks in social situations. (Id.) Dr. Mahmood described his mental status as very anxious, ill at ease, and noted that he sweated profusely during his session. (Id.) She described his thought processes as disorganized and his behavior as impatient. (Id.) She noted no change in his GAF score of 45. (Id.) In her treatment plan, Dr. Mahmood suggested Lamictal for his anxiety and Propanalol for "physical symptoms of anxiety such as tremulousness, stuttering, palpitations, sweating, etc." (Id. at 368.)

Dr. Mahmood again treated Wallace on June 5, 2009. (Id. at 369-370.) In a progress note, she described Wallace's mood as "anxious," but commented that Wallace believed that the Lamictal and Propanalol were helping him. (Id. at 369.) He requested stronger prescriptions for both medications, and Dr. Mahmood increased his Lamictal prescription. (Id. at 370.) On that date, she hand-wrote on a prescription notepad that "Brad is my patient

and he is unable to work at this time.  He has been unstable and not able to work for the last

one year."  (Id. at 349.)

In July 2009, Dr. Mahmood completed a "psychiatric/psychological impairment

questionnaire," which detailed her clinical findings and her assessment of Wallace's mental

health.  (Id. at 352-59.)  She noted that she treats Wallace every four weeks, and that his

current GAF score was 50, an improvement from his lowest GAF score of 40 for the past

year.  (Id. at 352.)  Her diagnosis was that Wallace was suffering from bipolar disorder with

a "guarded" prognosis.  (Id.)  Clinical findings included poor memory, sleep disturbance,

mood disturbance, psychomotor agitation or retardation, feelings of guilt/worthlessness,

social withdrawal or isolation, decreased energy, and generalized persistent anxiety.  (Id. at

353.)  Dr. Mahmood described Wallace's primary symptoms as mood swings and anxiety.

(Id. at 354.)   In rating Wallace's mental abilities, Dr. Mahmood noted that Wallace was

moderately limited, meaning "significantly affect[ed] but . . . not totally preclude[d]" in the

following abilities: understanding, remembering, and carrying out detailed instructions,

maintaining concentration and attention for extended periods, performing activities within

a schedule, maintaining regular attendance, sustaining routine without supervision, working

in coordination or proximity with others without being distracted, completing a normal

workweek without interruptions from psychologically based symptoms and performing in

a consistent pace, accepting instructions and responding appropriately to criticism, getting

along with co-workers or peers, maintaining socially appropriate behavior, responding

appropriately to changes in the work setting, and traveling to unfamiliar places or using

public transportation. (Id. at 354-57.) Dr. Mahmood evaluated Wallace as being markedly limited, meaning "effectively preclude[d] . . . from performing the activity in a meaningful manner" for the following abilities: interacting appropriately with others and setting realistic goals or making plans independently. (Id.) She opined that Wallace experiences episodes of deterioration or decompensation in work-like settings that cause him to withdraw or experience exacerbation of symptoms. (Id. at 357.) She listed Prozac and Lamictal as his medications. (Id.) Dr. Mahmood opined that Wallace is not a malinger, that his symptoms are ongoing, that he has "good days" and "bad days," and that he is incapable of even low stress due to severe anxiety and unpredictable mood swings. (Id. at 358.) She estimated that Wallace would be absent from work more than three times a month as a result of his impairments. (Id. at 359.)

The next month, in August 2009, Dr. Mahmood met with Wallace for 20 minutes. (Id. at 410.) She characterized his affect as elevated and his mood as anxious. (Id.) Wallace told Dr. Mahmood that he felt better on the medication but still experienced hyperactivity and anxiety. (Id.) Dr. Mahmood increased his doses of Lamictal and Propranolol. (Id. at 411.) She assessed Wallace's condition as improved but not in remission. (Id.) Dr. Mahmood's notes from a medical monitoring session on October 23, 2009, included the same findings. (Id. at 413-415.) When Wallace returned on January 25, 2010, he complained of heightened anxiety due to an experience testifying in court. (Id. at 416.) Again, Dr. Mahmood described his mood as anxious, his affect as elevated, and assessed his condition as improved but not in remission. (Id. at 416-417.) She started Wallace on Trazodone to improve his sleep. (Id.)

Dr. Mahmood's progress notes from a March 2010 session noted similar mental status and assessment. (Id. at 419-420.) In conjunction with the March visit, Dr. Mahmood and Michelle Talley, a therapist with the Ben Gordon Center, completed a Comprehensive Assessment Update. (Id. at 422-426.) They noted that Wallace "feels that the rapid cycling has gotten better and he is now more level," despite two or three week manic periods followed by times that he will not emerge from his room. (Id. at 422.) He was characterized as having an appropriate mood and normal affect. (Id.) Dr. Mahmood and Talley diagnosed Wallace with Bipolar I Disorder, MRE Mixed, Severe without Psychotic Features, with functional impairments in all aspects of his life. (Id. at 424.)

Dr. Mahmood completed a second psychiatric/psychological impairment questionnaire on May 10, 2010. (Id. at 401-408.) She diagnosed Wallace with bipolar disorder and social phobia, noted a current GAF score of 45-50, and "guarded" prognosis. (Id. at 401.) She identified the following clinical findings in support of her diagnosis: sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, psychomotor agitation or retardation, difficulty thinking or concentrating, social withdrawal or isolation, obsessions or compulsions, and generalized persistent anxiety. (Id. at 402.) She listed the following as Wallace's primary symptoms: severe anxiety, hyperactivity, racing thoughts, inability to focus, irritability and mood swings, with anxiety and mood swings indicated as the most frequent and/or severe. (Id. at 403.) In rating Wallace's mental abilities, Dr. Mahmood noted that Wallace was moderately limited, meaning "significantly affect[ed] but . . . not totally preclude[d]" in the following abilities: remembering locations and work-like

procedures, understanding, remembering, and carrying out detailed instructions, performing activities within a schedule and maintaining regular attendance, sustaining ordinary routine without supervision, completing a normal workweek without interruptions from psychologically based symptoms and performing at a consistent pace, and setting realistic goals and making plans independently. (Id. at 403-406.) Dr. Mahmood evaluated Wallace as being markedly limited, meaning "effectively preclude[d] . . . from performing the activity in a meaningful manner" for the following abilities: maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without distracting them or exhibiting behavioral extremes, responding appropriately to changes in the work setting, and setting realistic goals or making plans independently. (Id.) She opined that Wallace experienced episodes of deterioration or decompensation in work-like settings that caused him to withdraw or experience exacerbation of symptoms due to his severe anxiety and distractibility. (Id. at 406.) Dr. Mahmood further opined that Wallace is not a malinger and that his symptoms are ongoing, creating an expectation that they will last at least 12 months. (Id. at 407.) She concluded that because of Wallace's "severe anxiety and mood swings, he cannot tolerate any stress" in the workplace. (Id.) She suggested that Wallace's impairments are unlikely to produce "good days" and "bad days," contrary to her comments on a similar questionnaire dated July 6, 2009. (See id. at 407; 358.)

Dr. Mahmood entered a progress note on May 17, 2010, after a 15-minute appointment with Wallace. (Id. at 372.) She wrote that despite treating Wallace for over a year and treatment of "many medications and dose adjustments, he continues to have periods of hyperactivity and thought disorganization along with severe social discomfort and anxiety." (Id.) She also noted that, "[h]e is very distractible [sic], impulsive and disorganized. In my opinion he cannot retain any gainful employment without becoming worse psychiatrically." (Id.)

**B.    Wallace's Testimony**

Wallace testified at his hearing that the main reason he cannot work is that he "cycle[s] too often," meaning that "in my high mode, I try to do everything as fast as possible, and then when I'm on low mode, I don't do anything at all." (A.R. 38.) The modes last about a week. (Id.) He believes that he has lost four or five jobs because of his cycles, stemming from his inability to get along with coworkers and bosses during high modes and to maintain proper attendance during low modes. (Id. at 39.) He was let go from his last job and not called back. (Id. at 36.) He collected unemployment in 2008 and 2009 while looking for assembly jobs, but believed that if he had gotten a job, he probably would not have been able to hold it. (Id. at 36, 40.) Interviews and social interactions cause anxiety, which he experiences as palpitations. (Id. at 40-41.) He does not socialize apart from playing music with one or two people, which he does about once a month or once every two months. (Id. at 43-44.) When he is in low mode he does not play music with anyone. (Id. at 44.)

Wallace lives with his parents, his son, who was 14 years old at the time of the hearing, and his brother and his family. (Id. at 35.) He gets along with them but stays in his room most of the time. (Id. at 41-42.) When he is in high mode, he does all the chores around the house, but when he is in low mode, he does not leave his room. (Id. at 42.) Sometimes he will go a week or two without bathing. (Id.) He forces himself to go to school meetings for his son, but his son is not involved in extra-curricular activities so he does not have to go out much on his son's behalf. (Id. at 45.)

## C.   Medical Expert's Testimony

Mark Oberlander, Ph.D., a non-examining consultant, testified before the ALJ on the basis of his review of medical records dating from March 2009 through June 2009 and Dr. NieKamp's report from September 2008. (Id. at 49-50.) When he provided his expert opinion to the ALJ, he had not been furnished with Wallace's treatment records for July 2009 through June 10, 2010, the date of the hearing. (Id. at 49.)

Dr. Oberlander testified that based on his review of the limited medical records, he found symptoms of bipolar disporder, relatively rapid cycling, anxiety disorder, and dependent personality disorder. (Id. at 50-51.) He opined that "the level of treatment . . . noted in the medical record as well as by testimony has certainly been seriously inadequate," and the contacts with the treating physician were brief, "as brief as eight minutes." (Id. at 49, 51.) He also noted that the "adequacy of psychiatric treatment is highly questionable," suggesting that Wallace's apparent lack of treatment was out of line with his claimed symptoms. (Id. at 54.) He commented that it would be "very difficult for me to really

11

estimate" the frequency of Wallace's cycling based on the limited medical evidence he reviewed. (Id. at 54.) Based on his review, he opined that "[f]unctional limitation and capacity to engage in appropriate social interactions are moderately impaired," as is his "capacity to attend, maintain concentration persistence and pace." (Id. at 52.) He testified that when Wallace is in low mode, his social function, concentration and persistence and pace would deviate. (Id. at 54.) But, he stated that the "only significant area in which some allowance and accommodation need to be considered" is that Wallace needs "less than frequent contact with coworkers, supervisors, and the public." (Id. at 52.)

**D.     Vocational Expert's Testimony**

Timothy Tanzi, Ph.D., a vocational expert, testified that Wallace's past work as an assembler, a production assembler and fitter, and a building maintenance worker, were not precluded by limitations to occasional contact with coworkers, the public, and supervisors, or limitations to simple, repetitive work activities.  (Id. at 56.)  But he testified that "[e]mployers generally expect no more than one day missing from work per month," so if Wallace missed an average of three days per month, he would not be able to perform his past work.  (Id. at 57-58.)

**E.     ALJ's Decision**

After considering the proffered evidence, the ALJ concluded that Wallace is not disabled.  In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520, which requires him to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform [his] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).  If at step three of this framework the ALJ finds that the claimant has a severe impairment which does not meet the listings, he must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e).  The ALJ then uses the RFC to determine at steps four

and five whether the claimant can return to his past work or to different available work. 20 C.F.R. § 404.1520(f), (g).

Here, the ALJ found that Wallace has three severe impairments—bipolar disorder, anxiety disorder, and personality disorder—and concluded that those impairments or combination of impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (A.R. 18.) The ALJ found that notwithstanding Wallace's impairments, he retained the RFC to perform work that "requires simple, repetitive tasks and that requires only occasional contact with supervisors, co-workers, and the public." (Id. at 19.) The ALJ premised this RFC finding on Dr. Oberlander's opinion, which he adopted in its entirety, and his complete rejection of Dr. Mahmood's opinions, to which he assigned zero weight. (Id. at 22-25.) Based on this RFC, the ALJ concluded that Wallace could perform his past work as a small products assembler and building maintenance worker. (Id. at 25-26.)

## Analysis

In his motion for summary judgment, Wallace argues that the ALJ's decision is not supported by substantial evidence because the ALJ violated the "treating physician rule" when he assigned no weight to his treating physician's opinion. He also challenges the ALJ's credibility analysis for failing to consider some of the credibility factors provided by the Commissioner's regulations and for giving undue weight to other factors.

This court reviews the Commissioner's decision to ensure that it is supported by substantial evidence, *see* 42 U.S.C. § 405(g); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618

(7th Cir. 2010), and confines its review to the rationales offered by the ALJ. *S.E.C. v. Chenery Corp.,* 318 U.S. 80, 93-95 (1943); *Shauger v. Astrue*, 675 F.3d 690, 695-696 (7th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971). This standard of review precludes the court from "reweigh[ing] the evidence, resolv[ing] conflicts, decid[ing] questions of credibility, or substitut[ing] [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). But this court must remand the case if the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002), or fails to "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled," *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (internal quotation omitted).

Wallace persuasively argues that the ALJ's decision to give "no weight" to the opinions of his treating psychiatrist, Dr. Mahmood, is legally erroneous because it conflicts with the well-established treating-physician rule. That rule, which is codified at 20 C.F.R. §§ 416.927(d)(2) and 404.1527(d)(2), "directs the [ALJ] to give controlling weight to the medical opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (internal quotations omitted). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d

467, 470 (7th Cir. 2003). If the treating physician's opinion is contradicted by other well-supported evidence, then it is no longer entitled to controlling weight, and "the treating physician's evidence is just one more piece of evidence for the [ALJ] to weigh." *Bauer*, 532 F.3d at 608. The Commissioner's regulations provide a series of factors for the ALJ to consider to aid in deciding how much weight to give the treating physician's evidence. *See* 20 C.F.R. §§ 416.927(d), 404.1527(d).

The ALJ assigned no weight to Dr. Mahmood's opinions for three reasons: (1) the ALJ believed Dr. Mahmood's opinions to be unsupported by function-by-function analyses and in conflict with Wallace's testimony; (2) other evidence, including Dr. Oberlander's opinion of Wallace's RFC, contradicted Dr. Mahmood's opinion of disability; and (3) the ALJ believed that Dr. Mahmood's treating relationship with Wallace was too short, and her medical monitoring appointments too brief and too irregular, for an individual with the disabilities Dr. Mahmood described. (A.R. 23-25.) Wallace challenges the ALJ's rationale for his wholesale rejection of Dr. Mahmood's opinions.

The ALJ's perception of Dr. Mahmood's treating relationship with Wallace was likely skewed because Wallace submitted the majority of his medical evidence after the hearing—so neither Dr. Oberlander nor the ALJ had the benefit of Dr. Mahmood's comprehensive evaluations or the longitudinal picture of Wallace's treatment at the time of the hearing.[2] (Id. at 24.) Though the ALJ faulted Dr. Mahmood's opinions for being

---

[2] The ALJ did not strike the medical evidence that Wallace submitted after the hearing, and the Commissioner does not argue that the ALJ should have rejected that evidence. Rather,

unsupported by function-by-function analyses (see A.R. 24), Dr. Mahmood had, in fact, submitted two comprehensive evaluations and provided clinical findings supportive of her diagnosis, each including a functional assessment of Wallace's mental ability. One of those evaluations, dated July 6, 2009 (id. at 352-359), followed within weeks of Dr. Mahmood's initial June 5, 2009 opinion that Wallace was incapable of work (id. at 349), and was completed after she had the benefit of a 53-minute intake assessment on March 30, 2009 (id. at 361-365), and an additional 50-minute appointment with Wallace on May 1, 2009 (id. at 367). Dr. Mahmood completed the second evaluation, dated May 10, 2010, after 14 months of regular treatment. (Id. at 401-408.) Both of the comprehensive evaluations required Dr. Mahmood to analyze Wallace's functional abilities, grouped by understanding and his memory function, concentration and persistence, social interaction function, and adaptation function. (See id. at 352-359, 401-408.)

The ALJ acknowledged that Dr. Mahmood had completed these two comprehensive evaluations of Wallace—and even referred to one of them as a function-by-function analysis

---

he merely comments that "[p]laintiff did not offer any explanation regarding why these records were not submitted until after the hearing. At the hearing, Plaintiff's counsel only stated that the records had been requested, but they did not have them in the record." (R. 26-1, Def.'s Resp. at 8-9) (internal citations removed.) This court's review of the applicable federal regulations shows that Wallace was bound to "make every effort to be sure that all material evidence [was] received by the [ALJ] or [was] available at the time and place set for the hearing," 20 C.F.R. § 404.935, but it was within the ALJ's discretion to consider the evidence that Wallace submitted after the hearing but before the ALJ rendered a decision. *See* 20 C.F.R. § 405.331(a) ("Any written evidence that you wish to be considered at the hearing must be submitted no later than five business days before the date of the scheduled hearing. If you do not comply with this requirement, the administrative law judge *may* decline to consider the evidence . . . .") (Emphasis added).

(id. at 24)—but discounted them because he found them unsupported by the medical evidence and an overstatement of Wallace's symptoms as compared to Wallace's testimony. (Id. at 25.)   Regarding the first functional analysis, the ALJ commented that no medical evidence was submitted to support it, but the ALJ did not acknowledge Dr. Mahmood's progress note from the previous month summarizing that Wallace was "very anxious" and "very ill at ease and sweat[ing] profusely" during his appointment, exhibiting disorganized thought processes, complaining of worsening symptoms of his bipolar disorder and social anxiety and an ability to sleep for days at a time.  (Id. at 367-368.)

Regarding the second functional analysis, the ALJ discounted it because it was dated May 10, 2010, which he believed to be the date of the hearing, but on this point the ALJ was mistaken: according to the hearing transcript, the hearing took place on June 10, 2010, a month after Dr. Mahmood evaluated Wallace. (See id. at 34.)  The ALJ rejected the analysis also on the basis that it too was without supporting medical evidence, but did not explain away the record of four medical monitoring appointments with Dr. Mahmood, two of which resulted in increased medication due to Wallace's symptoms.  (See id. at 410, 416.)  Perhaps the ALJ did not recognize these treatment records as supportive of the functional analysis because they were submitted independently from it, after the hearing.  (Id. at 25.)  In any case, the ALJ rejected the treatment records as stand-alone evidence of disability because he characterized them as showing improvement in Wallace's functioning.  (Id.)  While the medical monitoring records do confirm some improvement, they also describe Wallace as anxious and not in remission, and they document Dr. Mahmood's decisions to increase the

dosages for some of Wallace's medications. (Id. at 410, 416.) The strengthened prescriptions suggest that Dr. Mahmood believed that Wallace's symptoms were not adequately controlled, thus lending some support to the functional analyses. In short, the ALJ's conclusion that Dr. Mahmood submitted no functional analyses is contrary to the facts and is an improper basis for rejecting her opinions.

The ALJ's secondary reason for rejecting Dr. Mahmood's functional analyses—that they were contradicted by Wallace's testimony regarding his daily activities—is also problematic because it conflicts with *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008.) The ALJ seized on the one element of Wallace's testimony that showed an ability to engage in social interaction on demand: his testimony that he forces himself to attend school conferences for his son. (Id. at 45.) The ALJ cited this testimony to show that Dr. Mahmood had overstated Wallace's limitations. (Id. at 25.) But even if attending a school conference is analogous to work, the ability to do so a few times a year is not the same as the ability to sustain a full work-week, and does not contradict Dr. Mahmood's opinion that prolonged, regular exposure to the pressures of a work-like setting would adversely impact Wallace's psychological state. As the Seventh Circuit explained in *Bauer,* that a heavily medicated claimant with bipolar disorder can perform household chores and care for a teenager is not sufficient to discount the treating physician's opinion, developed after years of treatment, that a claimant cannot hold down a full-time job. *Bauer,* 532 F.3d at 608-09. The Commissioner's argument that Dr. Mahmood's contemporaneous treatment notes show that Wallace attended his doctor appointments with appropriate dress, appearance and behavior,

normal thought content, process, and speech, and cooperative attitude, and therefore showed an individual capable of working, is similarly in conflict with *Bauer. See Bauer,* 532 F.3d at 608-09 ("that the plaintiff dresses appropriately, shops for food, prepares meals and performs other household chores, is an 'active participator [sic] in group therapy,' is 'independent in her personal hygiene;' and takes care of her 13-year old son" is not a basis for disregarding the claimant's doctors' opinions).

The ALJ's third rationale for rejecting Dr. Mahmood's opinion—that it was contrary to the opinion of the non-examining psychologist, Dr. Oberlander—is most troubling. Dr. Oberlander, a non-examining psychologist, based his opinion on a review of only four months of Wallace's medical file, consisting of only two progress notes from Dr. Mahmood. Without the benefit of the records of the twelve months of medical monitoring and comprehensive evaluations that followed, Dr. Oberlander testified that an individual with Wallace's claimed disabilities would need more treatment than the few available records showed that he had had, suggesting that Wallace's lack of treatment belied the veracity of his claims. (Id. at 53-54.) But because Wallace had actually engaged in much more substantial treatment than Dr. Oberlander realized, the relevance of Dr. Oberlander's opinion is in doubt. Moreover, a "contradictory opinion of a non-examining physician does not, by itself, suffice" to reject an examining physician's opinion. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Here, Dr. Oberlander did not reject Dr. Mahmood's conclusions because of any failing in her diagnostic methods, but rather based on the fact that the medical record he reviewed was insufficient to evaluate Wallace's claims of rapid cycling. (A.R. at

20

49, 52-54.) If he had reviewed Wallace's entire medical file, his opinion may have been different.

The Commissioner argues that Dr. Oberlander's assessment should control for three reasons, but none of them are persuasive. One, the ALJ had the benefit of the entire medical record and adopted Dr. Oberlander's opinion regardless. But as discussed above, the ALJ's stated reasons for rejecting Dr. Mahmood's opinion were improper. Two, the opinion of Dr. NieKamp, an examining psychologist consultant, supports the ALJ's adoption of Dr. Oberlander's opinion. But this argument is not persuasive because it overlooks Dr. NieKamp's opinion (also excluded from the ALJ's discussion of Dr. NieKamp's report) that Wallace's anxiety and depression inhibits employment. (Id. at 297.) Three, the opinion of Dr. Hermsmeyer, a state agency psychologist who reviewed Wallace's medical file and opined that Wallace retained the capacity to perform simple tasks at a consistent pace, is supportive of the ALJ's adoption of Dr. Oberlander's opinion. But because the ALJ did not cite to Dr. Hermsmayer's opinion, the Commissioner cannot advance this argument here. *Larson v. Astrue,* 615 F.3d 744, 749 (7th Cir. 2010.)

Also, when the ALJ determined that Dr. Mahmood's opinion was not entitled to controlling weight, the treating-physician rule required him to weigh the following factors to decide what weight to afford it: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the treating physician; and (6) any other factors which tend to support or

contradict the opinion. 20 C.F.R.§§ 404.927(d)(2)-(6), 404.1527(d)(2)-(6). As Wallace points out, the ALJ's analysis of these factors is scant and not consistent with the record. For example, the ALJ assigned no weight to Dr. Mahmood's May 17, 2010 opinion partially because he believed that she treated Wallace only once every twelve weeks, when the record shows that Dr. Mahmood issued that opinion after evaluating Wallace seven times over a one-year period. Moreover, while the ALJ discredited Dr. Mahmood for having appointments with Wallace that were 20 minutes long (A.R. 25), he did not consider that Dr. Mahmood met with Wallace for 53 minutes in March 2009 and 50 minutes in May 2009 (id. at 334-338, 367). In regards to both factors, it appears as if the ALJ cited evidence supportive of his opinion and excluded pertinent evidence that conflicted with it. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (stating that the court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or . . . fails to build a logical bridge between the facts of the case and the outcome") (internal citations omitted). The ALJ rejected the supportability and consistency of Dr. Mahmood's opinions for reasons that this court finds questionable and does not seem to have credited Dr. Mahmood for delivering care within her speciality of psychiatry. For all of these reasons, the court agrees with Wallace that the ALJ misapplied the treating-physician rule by assigning zero weight to Dr. Mahmood's opinion.

**B.     Credibility**

Wallace also challenges the ALJ's credibility determination, a determination that is "afforded special deference because the ALJ is in the best position to see and hear the

witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). This court will reverse only if the credibility assessment is patently wrong, *see Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007), meaning it "lacks any explanation or support," *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). But where the "credibility determination is based upon objective factors rather than subjective considerations, we have greater freedom to review the ALJ's decision." *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008.)

The Commissioner's regulations direct the ALJ to follow a two-step process for evaluating symptoms: first, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the individual's symptoms; second, the ALJ must evaluate the individual's statements about the intensity, persistence, and limiting effects of his symptoms. SSR 96-7p, 1996 WL 374186 *2. The ALJ concluded that Wallace's "allegations regarding the limiting effects and the severity of the symptoms of his impairments are only partially credible." (A.R. 25.) Specifically, the ALJ disbelieved Wallace's statements about his debilitating social anxiety because he meets friends for music-making on a monthly basis, attends school conferences and scheduled doctor appointments, and had a history of landing jobs before his onset date. (Id. at 23.) The ALJ also noted an inconsistency between Wallace's testimony that he does not struggle with memory and concentration and reports of the state agency employees that Wallace was giggling and laughing inappropriately during a phone interview and appeared easily distracted during another evaluation. (Id. at 23-24.) The last issue that the ALJ raised about Wallace's credibility was his collection of unemployment benefits after his onset date. (Id.

23

at 24.)  The ALJ concluded that Wallace's application for unemployment benefits showed that he was hopeful that he would find employment, which he found contradictory to Wallace's testimony that his rapid cycling prevents him from maintaining employment. (Id. at 24.)

The primary weakness in the ALJ's credibility ruling is not in his step-two analysis of Wallace's testimony, as Wallace suggests, but in his analysis of the objective medical evidence that substantiated Wallace's claims.   The ALJ's erroneous rejection of Dr. Mahmood's opinions undermined Wallace's ability to show at step one that his bipolar, anxiety, and personality disorders could reasonably be expected to produce the symptoms he claims.  Without Dr. Mahmood's opinions, the only medical evidence under consideration was that of the non-examining psychologist, Dr. Oberlander, who opined that there was insufficient medical evidence to support the rapidity of Wallace's alleged cycling, (A.R. 53-54) and therefore the severity of his symptoms.   Perhaps had the ALJ had the benefit of the majority of the Dr. Mahmood's treating records and functional analyses before the hearing, he may have evaluated the severity of Wallace's medical condition differently and thus may have had a different perspective on Wallace's credibility.

Wallace challenges the ALJ's adherence to the two-step standard in three respects. First, he argues that the ALJ provided an inadequate explanation of his finding that Wallace's testimony was only partially credible.   On this point, this court does not agree—the ALJ indicated which of Wallace's statements he disbelieved. *See* SSR 96-7p, 1996 WL 374186, at *2 (requiring the ALJ to "be sufficiently specific to make clear to the individual and to any

subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight"). Second, Wallace argues that the ALJ's assessment of his daily activities overstates his testimony. As Wallace points out, SSR 96-7p requires an ALJ to consider a number of factors when assessing a claimant's credibility, including his daily activities, the duration and frequency of his symptoms, the factors that precipitate and aggravate those symptoms, and any measures he uses to alleviate the symptoms, including medication. 1996 WL 374186, at *5. Here, the ALJ did not consider the many medications that Wallace takes to tame his rapid cycling, depression, and anxiety, nor did he adequately consider Wallace's claim that social encounters trigger palpitations and anxiety, a claim borne out by his medical records. (A.R. 416.) Moreover, as Wallace argues, the ALJ's assessment of Wallace's daily activities is flawed because it equates Wallace's monthly music-making (which he avoids during his low periods) with the ability to work, a conclusion that is foreclosed by *Bauer*. Wallace testified that he is unable to leave his room during his low cycles, sometimes for as long as a week at a time, and sometimes avoids showering during those periods. (Id. at 42.) The ALJ did not explain why this testimony was not believable or how Wallace's very minimal daily activities conflict with his claims of disabling mental disorders.

Wallace's final challenge to the ALJ's credibility determination is worth noting as well. Wallace argues that the ALJ should not have considered his receipt of unemployment benefits when assessing his credibility. The Seventh Circuit has held that "a claimant's representations in seeking unemployment benefits may be relevant in assessing the credibility

of her representations to the SSA," but if a claimant seeks unemployment benefits because he has no other source of income, collection of the benefits "does not necessarily mean [he] is not disabled." *Richards v. Astrue*, 370 Fed.Appx. 727, 732 (7th Cir. 2010) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005)). The Commissioner argues that the ALJ's consideration of Wallace's collection of unemployment benefits was just one factor in his analysis, and was therefore permissible. But Wallace also testified that his job interviews were "very scary" and he doubted that he would be able to hold down a job due to his problems interacting with co-workers and supervisors. (Id. at 40.) This testimony, which the ALJ did not discredit, suggests that Wallace sought unemployment benefits out of financial need and did not believe himself capable of holding down a job. "A desperate person might force [himself] to work-or in this case, certify that [he] is able to work-but that does not necessarily mean [he] is not disabled." *Richards*, 370 Fed.Appx. at 732.

Because the ALJ's credibility analysis follows from his erroneous rejection of Dr. Mahmood's medical opinion and fails to adequately weigh Wallace's daily activities and other aspects of his testimony, this court is unable to sustain it. This is not to say that the credibility determination cannot stand upon the ALJ's reevaluation of the medical evidence and Wallace's testimony on remand, but a reevaluation in light of the full medical record is required.

## Conclusion

For the foregoing reasons, Wallace's motion for summary judgment is granted insofar as it requests a remand for further proceedings consistent with this opinion.

ENTER:

_____
**Young B. Kim**
**United States Magistrate Judge**